Ladies and gentlemen, our first case is the Oakland Police v. Mayer Brown, Ms. Blauner. Good morning, your honors. Michelle Blauner for the Plaintiff Appellants. This case presents the court with a unique set of circumstances and asks the court to answer the following question. Have the plaintiffs plausibly alleged that Mayer Brown owed a duty to J.P. Morgan, a long-standing and current client of Mayer Brown, for a matter in which Mayer Brown did not represent J.P. Morgan, but in which Mayer Brown assumed responsibility for preparing and filing UCC termination statements at GM's direction, which released Collateral for the wrong loan. As a result of Mayer Brown's undisputed negligence and conceded mistakes, the term loan lender's security interest in Collateral securing a $1.5 billion loan  Can we assume your clients are pursuing Simpson Thatcher and J.P. Morgan? Our clients are not currently pursuing a claim against Simpson Thatcher. Why not? There are a variety of reasons that I can't get into for the purposes of, because of attorney-client issues. Claims J.P. Morgan are being pursued in the GM bankruptcy as a cross-claim against J.P. Morgan in the adversary proceeding. So there are claims that are being pursued against J.P. Morgan in the adversary proceeding that is pending in New York. On what basis do you think Mayer Brown had a duty to your client? Well, we allege, we claim that there are four different independent basis for Mayer Brown's duty to our client. The first basis is that Mayer Brown and J.P. Morgan had an ongoing attorney-client relationship at the time that Mayer Brown engaged in this negligent conduct. So that argument assumes then that, I mean I can't imagine this kind of transaction could happen without a waiver. We'll talk about that. But it sounds like it's impossible from your perspective for a client like J.P. Morgan to waive conflicts because Mayer Brown would still owe it a continuing duty of loyalty and candor when it's on the opposite side of the table, correct? Well, Your Honor, first of all, as to the issue of waiver, that is not in the record in this case and that is an affirmative burden that I saw your argument about it, but it's inconceivable that this didn't happen, that there wasn't one. And as to whether there is a waiver, that is a, the question of waiver here and whether this type of contract is waivable depends on whether J.P. Morgan could have given informed consent to the waiver. And we don't know that there was any basis on which they could give informed consent. But we also know that... So you don't think a client, a current client can give valid consent for adverse representation in unrelated matters? I think a client could under certain circumstances give valid consent... Virtually the entire legal profession in modern America is built on the assumption that such waivers are valid. I think it depends on the circumstances. Absolutely, in a vast majority of cases such waivers could be valid, but we don't know the circumstances here of the alleged waiver. And so we can't, on the record, on a motion to dismiss, assume that there is a waiver here, assume that it is that these two clients would not have gone into adversarial negotiations without a valid waiver. How could Mayor Brown continue to have, in the face of such a waiver, duties of candor and loyalty to the party on the other side of the table when it owes duties of loyalty, candor, competence and everything else to General Motors on its own side of the table? I think there are two answers. First of all, I think the assumption that this was an adversarial situation is certainly... It's a lender and a buyer. But this was a previously negotiated transaction. This was really ministerial at the time in 2008, at which time the payoff was happening. There was nothing to be negotiated. There was just documentation. There was nothing to be... You don't know. There could be disputes. We haven't alleged that there were disputes. We've alleged that there weren't any disputes. We've alleged that this was a cooperative transaction. We've alleged that the parties divvied up responsibilities as to who should... But you still haven't explained, at least to my satisfaction, what is the source of Mayor Brown's having a duty to your client? Okay. I was trying to get to the first point and I said that we would... Now, just answer this question. What is the source of its duty to your client? Source of its duty... Usually we think of law firms having a duty to their clients, not to someone else. But there is also, under Illinois law, there are duties that a law firm can have to a third party under several different types of circumstances. There is a duty here, under an exception recognized in the Pelham case, because of the voluntary undertaking that Mayor Brown... Where Mayor Brown took responsibility for preparing the erroneous UCC3 terminations. For doing what? For... Took responsibility for what? For preparing and filing the erroneous UCC3 terminations. I'm the erroneous UCC3 termination statements. We've alleged in the complaint that they took responsibility for that task in this non-adversarial situation. And under an... How did they take responsibility? They communicated that it was going to be the responsible party for those documents in three different emails cited in the complaint at paragraphs 61, 63, and 67. And was that communication with your client? The communication was with the attorney for J.P. Morgan. Yeah, but that's... Instead of having two people do a first draft, they said we will draft it and then circulate it. That's not alleged in the complaint. Well, isn't that what happened? No, what happened is that they took responsibility for this document. Those documents cannot be filed to release collateral without the signatures of J.P. Morgan, can they? They cannot, and we say that... Right. Review by J.P. Morgan and its lawyers, right? I'm sorry, I couldn't hear you. And that we know that they were reviewed by both J.P. Morgan and its lawyers, Simpson Thatcher. That's what the Second Circuit said, right? We do not contest that it was... That the documents were provided to Simpson Thatcher and J.P. Morgan. And approved and signed by Simpson Thatcher and J.P. Morgan respectively, correct? Based on the misrepresentations that Mayor Brown made to them in the closing, based on the misrepresentations that Mayor Brown made to them in the closing checklist and the escrow instructions in which they told J.P. Morgan that these documents had to be signed for in order to secure the synthetic lease payoff. When J.P. Morgan signs any document, anybody presents to it? It is our contention here that it did, that it relied on that, on Mayor Brown's representation, that these documents were necessary. And the fact that Simpson Thatcher may have also been negligent. And how did Mayor Brown's representations, how did that harm your client? Because it authorized the filing of the UCC-3 termination statements based on those misrepresentations. And that is the event that caused... And then after that, Mayor Brown filed the UCC-3 termination statements. And that was the event that caused the release of the collateral erroneously. With regard to that, and as far as the release, I assume, maybe I'm wrong, was there a subordinate in that that was affected by that release that then became prior? No, what happened is because J.M. filed for bankruptcy before they discovered that the UCC-3 termination statement was filed erroneously, the security interest got voided in the bankruptcy court. Well, is it because they got away with getting money when they were an unsecured creditor? Yes, they were. So what happened in the bankruptcy is that the term loan lenders got paid out the amount of the loan, and now there are clawback actions by the creditors, the official committee of unsecured creditors in the J.M. bankruptcy to get that money back now that the Second Circuit has found that the security interest was not valid. Okay, and these were lenders as opposed to the bondholders, the people who had bought the debt. They got wiped out, as I remember. Yes, this is a different group. There are a number of... These were secured, and the people who bought, invested in the debt, that got that wiped out. I know that's not in this case, but they were not protected. Correct. They were not secured lenders. The term loan lenders were secured lenders, but because of the error, their security interest got wiped out in the bankruptcy, and so now they are being treated as unsecured creditors, general creditors. So is it your view that J.P. Morgan was deceived by Mayor Brown? Yes, that is our... And Simpson also? When you say J.P. Morgan was deceived, doesn't J.P. Morgan have its own lawyers? Just because there are... No, answer my question. Does J.P. Morgan have a lawyer? J.P. Morgan did have a lawyer. So when J.P. Morgan received this stuff from Mayor Brown, didn't it check with its lawyers? I don't know the answer to that. The Second Circuit has told us that they did, that Simpson Thatcher looked over those documents and approved them, right? Yes, but I think the question was whether there was a conversation between J.P. Morgan and Simpson Thatcher, and I don't know the answer to that question. But we do know that the documents were provided to Simpson Thatcher. Which one said, nice job? Correct. Which one? Simpson Thatcher did. So is your position Simpson Thatcher and J.P. Morgan blew this? Our position is that Mayor Brown, Simpson Thatcher, and J.P. Morgan blew this. But that there are... You can have multiple parties who are responsible for negligence and contribute to the injury. So you think J.P. Morgan and Simpson Thatcher and Mayor Brown, they're all liable? Yes. To your clients? Yes. Yes, and there are a number of cases which have addressed this situation where... What about your clients? Does your client have a lawyer? Have a lawyer in what context? They were not represented during the adversary proceeding, if that's your question. So they had no lawyer to check on these activities by J.P. Morgan and Simpson and Mayor Brown? That's correct. They were not involved because J.P. Morgan, as administrative agent for the lending, was able to execute all the documents without seeking input from the 400 term loan lenders. So the term loan lenders were not... were represented by J.P. Morgan in the context of this transaction. Was your client the one subject to the clawback, so-called? Our clients are defendants in the clawback action. That's correct. Ms. Bonner, can I ask you to comment on something the defendants said in their brief? Obviously, the general rule in Illinois is that a lawyer owes duties only to his or her client. There are some exceptions. The defense has told us that the Illinois... non-clients has actually been enforced in only three situations. One, the decedent's family members. Second, a decedent's... I'm sorry, what did you say, David? That a lawyer's duty in tort to non-clients has been enforced in only three situations. But when there's a decedent... in favor of a decedent's client's family members or heirs, or when an opinion letter has been prepared at the request of the lawyer's own client for the opposing party, do you disagree with that description? What I would say is that in the Pelham case, they recognized another, an exception... I'm not talking about just language and opinions. I'm talking about actually recognizing in a case ruling in favor of a non-client. I would say that the opinion letter situation is very similar to the situation that the Pelham Court recognized as the exception, which is... And if you look at the two cases that the Pelham Court cited, which was the Schwartz case and the Stewart case in New Jersey and New York as the basis for this exception, those were UCC cases. Those were cases where the Schwartz case is particularly apt because in that case, which Pelham said, this is, you know... What I find very troublesome about your position is that anytime a lawyer makes a mistake in advising a client, some third, fourth, fifth party might be adversely affected by this mistake. And so the liability of lawyers would be vastly extended. Well, in this... Any mistake a lawyer makes could have repercussions for other people, for complete strangers. But these weren't complete strangers. And in this case, you have J.P. Morgan, who is acting as administrative agent. Mayor Brown knew that they were acting as administrative agent. Mayor Brown also knew that the UCC through termination statement was releasing collateral that was located in states where the synthetic lease collateral wasn't located. So this isn't some unknown. They knew exactly that when J.P. Morgan was signing it, that it was administrative agent. They also knew at the time that they told them that they needed to sign this document, that this document was releasing collateral in locations which were completely unrelated to the synthetic lease. So here you have a law firm with knowledge of its... Negligence is not in dispute here, right? That's correct. By anybody's, on anybody's part. That's correct. How much are you seeking from Mayor Brown? How much are we seeking?  In part based on what is happening in the adversary proceeding in the bankruptcy. There's a dispute in the bankruptcy over whether there is still enough security from other... So you haven't specified a number and damages? Well, it could be up to $1.5 billion less the... You're asking for $1.5 billion from Mayor Brown? Not... I'm not... I don't think that the amount here is determined because the loan was... If Mayor Brown defaulted today, what judgment would you seek? We couldn't determine that until we know how much collateral... Is this lawsuit ripe? It certainly is ripe because these terminal lenders have been subject to the clawback action. The question is how much is the GM unsecured creditors committee going to claw... Be able to claw back. That is being resolved currently in the bankruptcy court depending on... Depending on how much security there still is left and... General Motors has improved substantially, right? This is a claim that is held by the creditors committee as opposed to GM. So because in the bankruptcy, GM got divided up between the new GM and what's the old GM that is being represented by the creditors committee. And so we have a situation where the... So it's the old GM's creditors committee that is pursuing the clawback action as part of the bankruptcy, not the current operating company. Okay. Well, thank you, Ms. Plowman. Thank you. Mr. Novak? Okay. Good morning and may it please the court. I'd like to start by answering Judge Hamilton's direct question, which I don't think was answered. You're 100% right that the only three times... Types of cases where a duty has been found to a non-client are the three situations that your honor described. And the reason for that is because Pelham, which set out a limited, very limited exception, requires a very big threshold for pleading a negligence claim against the non-client. The client has to have had as its primary purpose and intent. And this is the client. So we're talking about GM's intent. GM's intent here under that exception had to be, and its primary intent, had to be to benefit or influence J.P. Morgan. And plaintiffs in their amended pleadings recognized that and in paragraph 33 made a bare bones conclusory allegation to that effect. However, the district court dismissed finding that allegation conclusory, not supported by fact, and implausible. And the district court was absolutely correct. That conclusion is what we call a threadbare recital of a necessary element of a claim. But it was unsupported by fact. And it's respectfully, facially implausible. There's just no possibility that that was GM's primary intent. And in determining plausibility, as this court very recently recognized in the West Bend Mutual case, the court looks at all the circumstances and then decides plausibility by drawing on its judicial experience and common sense. And doing that here, let's see what the circumstances are. This was a $150 million payoff involving multiple properties located in eight different states. There were two very sophisticated parties on opposite sides. GM was the borrower. J.P. Morgan, as agent for the synthetic lease lenders, was the lender. Both were represented by very sophisticated counsel. J.P. Morgan was represented by Simpson Thatcher, one of the largest, most well-known law firms in the country. And given all this, it's obvious that GM needed its own lawyer. It didn't hire a lawyer for J.P. Morgan. It needed its own lawyer to make sure it didn't overpay, to make sure that all the collateral that stood for this loan was released. It needed a lawyer to make sure that all the documents were proper, informed, and substance so that J.P. Morgan couldn't later come back to seek more money from GM. So it's completely implausible that GM retained Mayor Brown for the primary purpose of influencing J.P. Morgan to sign drafts, sign and approve drafts prepared in the first instance by Mayor Brown. And that's particularly so. It's particularly implausible, Your Honors, considering that GM knew that J.P. Morgan was going to have counsel. GM knew that whatever influence it thought a lawyer for it could have in preparing drafts, at the end of the day, J.P. Morgan was going to look to its own counsel before it approved those drafts. That's what GM knew going into this. And even though two parties to a transaction— Well, where does Mayor Brown figure in this? Pardon? Where does Mayor Brown figure in this? Well, what we know is that Mayor Brown did the first draft of a closing checklist. And in that first draft, it listed the UCC-1s that it believed needed to be released. But it was a draft only. And we know that out of plaintiff's own allegations in paragraph 60. This was a draft it prepared for General Motors? You know, it was prepared for the deal. It was between lawyers. The record's silent. Well, who is Mayor Brown representing? GM and only GM. And GM was doing all of its work for Mayor Brown and solely for Mayor Brown. It submitted the draft, in addition to its own side reviewing, to Simpson Thatcher for its review. The complaint says it was a draft. That was Mayor Brown's take on which property should be released. Simpson Thatcher, looking at this through the lens of its own client, J.P. Morgan, reviewed that draft and agreed that that mistakenly released property was appropriately released. And it said, nice job. I think one of your honors pointed that out. You say this mistakenly released property was properly released? Is that what you said? No. I'm saying that it was a mistake that it was released. What's the mistake? The mistake was that property that stood as security for the term loan did not also stand as security for the synthetic lease. So a property that shouldn't have been released was released. There's no dispute about that. And Mayor Brown did put that property on its draft, that it sent the draft to J.P. Morgan's lawyer, Simpson Thatcher, so that it could look and see, hey, is that right? And what did Simpson Thatcher say? They said, that's right. You did a nice job. You've got the right properties. It then transmits that. So you're saying that Mayor Brown didn't make any mistakes? No. Mayor Brown was part of the process. Well, you said Mayor Brown sent something to J.P. Morgan, which showed it to Simpson Thatcher, and Simpson Thatcher said it was fine. So what's Mayor Brown's mistake? Well, it went along with the release of that property, but it did not harm... Simpson Thatcher said it was fine. That's right. And that did not harm GM, Mayor Brown's client. So what was the mistake? You say there was a mistake. What was the mistake? Well, as I understand the allegation, the allegation is the mistake was that something that shouldn't have been in there. The release of collateral on another loan. The release of collateral. You've admitted that. It's not a question. That was the mistake. Right. But the issue here is duty. Okay. But don't hesitate what the mistake was. I'm not hesitating. There was a mistake. I said it. But the point is that a mistake isn't a loan grounds for liability. There has to be a duty. That's the first element. I thought you said the mistake was harmless. It was harmless to GM. It did not hurt GM. Well, who did it hurt? Well, for the allegation, isn't it hurt? In this case, the allegation hurt the term loan lenders. Not yet, perhaps, but we'll see. But it's likely to. Right. But in response to Your Honor's question about rightness, the case is right. The law in Illinois is that if there is a mistake, and we have to assume there's a mistake for purposes of the case, and we acknowledge that there was a mistake, attorney's fees incurred because of that mistake are damages. And the clock starts running. It's a cause of action. Okay. Could I ask you, Mr. Novak, the plaintiff's theory, at least a theory, seems to be a notion that Mayor Brown was not so much GM's lawyer in this deal, but attorney for the deal, a concept that at least still seems fairly novel to me in terms of professional ethics. But if we take another one of Judge Gettleman's decisions, the freedom mortgage case, where at least as I understand it, he's saying that in the context of residential real estate closings, then this kind of a claim might well be viable. That is, if a lawyer is acting as closing agent and messes up the filing and releasing of various mortgages and payoffs and so on, that any party to the transaction might have a claim against the lawyer who makes such mistakes. And I guess if we subtract about five zeros off the value of the transaction, you would run into situations like that. But I guess I'm trying to understand, do you think that freedom mortgage analysis is correct? And if so, where do we draw a line between that and this case? Well, the freedom mortgage analysis may well have been correct, but Your Honor hit the nail on the head when you described the lawyer in that case as a closing agent. That lawyer had a title company. The lawyer was acting as closing agent with duties to both sides. It was a neutral. And Judge Gettleman said, as a matter of fact, that the work was non-adversarial, thereby supporting one factor for supporting the duty. And he qualified that by saying, in the sense that an attorney's services as a closing agent are typically relied on by all parties. In this case, Mayor Brown was not acting as a closing agent. He was acting as a very far from that. It was acting as lawyer for one side of the deal. In every deal, Your Honor, in every deal, somebody's got to do a first draft. And in many cases, the first drafts are divided up. One party might do the first draft of the loan agreement. One party might do the first draft of the purchase agreement. But if first drafts create a duty to the other side, that's going to turn duties on their head. And in every single case, whatever lawyer does the first draft is going to be said to owe a duty to the other side, which will collide with the duties of undying loyalty and zeal that a lawyer is supposed to represent his or her own client. Mr. Novak, could you address the plaintiff's argument that J.P. Brown, in unrelated matters, and also the issue that they raised in their reply brief about waiver of conflicts being a matter of an affirmative defense and really beyond the scope of anything that could be considered here at this stage of this case? Well, the waiver of the conflict under the allegations of this complaint and the causes of action that the plaintiffs are trying to assert is kind of irrelevant because there is no allegation in this complaint. Nowhere in this complaint is there an allegation that it was improper for Mayor Brown to represent GM. There's no allegation of that. There's no claim for conflict of interest. So the waiver issue is irrelevant. Counsel was, of course, right that it's outside the record. But the agent of the plaintiffs is J.P. Morgan knows whether there is a waiver. So the term loan lenders know that answer. They have not alleged that there wasn't a waiver. And I think that just speaks for itself. So the question of whether the fact that Mayor Brown was a lawyer on other unrelated matters is the second part of your Honor's question. Lawyers' duties are limited to the subject matter of the particular representation at hand. So for the synthetic lease payoff, J.P. Morgan was not a client of Mayor Brown, regardless of whether it's a client on unrelated matters. We cited an Illinois appellate case called Fitch. It's right on point because the court there said a lawyer does not owe a duty to a client, an existing client. Even on the existing matter, with respect to something that relates to an unrelated matter. And as far as whether Mayor Brown undertook a duty here, we heard a lot of argument that, well, Mayor Brown volunteered for all this. Mayor Brown didn't undertake this duty. Mayor Brown, the very thing that said responsible party was itself a draft. And all it said on there was that Mayor Brown would be the responsible party for a draft. Three hours later, the email made that clear that it was for the draft. At no time did Mayor Brown undertake the sole responsibility for deciding which of these properties were to be released. All it did was suggest a group of them. J.P. Morgan, again, through the lens of its own client and on behalf of its own client, agreed with that. Mayor Brown owed no duty to J.P. Morgan. And even if there's a mistake, and I'm going to concede there was, there's no duty, and hence there can be no liability. Now, let me address a few more matters in my remaining time. Council started out by acknowledging Pelham as the lead case here, but said that there's a voluntary undertaking set forth in Pelham itself. That's completely wrong. The paragraph that council is relying on in the plaintiff's brief cites says only that the situation would be different if there were an undertaking, but then it doesn't answer the question of whether that would cause a liability. It just says that may cause liability. So Pelham did not answer the question of whether a voluntary undertaking would create a duty. And doesn't Gieson answer that question in a bit, though, with the, maybe I'm mispronouncing it, but the opinion letter case? Well, the appellate court case, which deals with the opinion letter, finds that the client, focused on the fact that the client's intent, the client directed the opinion letter to be signed. The client directed the opinion letter to be addressed to the non-client. The client directed that the lawyer say to the non-client, you can rely on me. That's a totally different situation. And both it and the Supreme Court in Gieson limited the duty to the specific opinions contained in the letter and refused to go outside of that to create a general duty to the other client. In fact, the Supreme Court said, this isn't even a fiduciary duty. The fiduciary duty is owed only to the client. And because the client directed the lawyer to give opinions to the non-client, that was the duty that the lawyer had. But that duty was not to the non-client. It was to its own client. And opinion letters are completely distinct from what's happened here for all the reasons I just said. There is no voluntary undertaking exception. The only cases that have even mentioned that have been in the context of opinion letters. And those are where, again, the lawyer's acting at the direction of the client. Here, the allegation is. Thank you, Mr. Nelson. Thank you, Your Honor. Your time expired, Ms. Brown. If you want another minute, you can have it. Your Honor, I really think that the question about Gieslin was very important because Gieslin did recognize that there is a voluntary undertaking exception. Subsequent to Gieslin, auto owners recognized that there was an exception. It didn't apply it, but it recognized it. The Wyatt case recognized that there was an exception. And if you look at the cases cited by Pelham, and that is the most, the best evidence of what the Illinois Supreme Court thought of the nature of the exception is the Schwartz case and the Stewart case. The Schwartz case is almost identical to this case. The borrower's attorney volunteered to file, to draft and file a UCC-1. He filed it in the wrong county. And the court in that case, which was cited with approval in Pelham, said that the borrower's attorney owed a duty to the lender when that security interest was wiped out in bankruptcy. That case is so close to the facts of this case. Well, Mr. Novak says that Mayor Brown just did a draft. That's not the allegation of the complaint. The allegation of the complaint, which the court must accept for the purposes of the motion to dismiss, is that they took responsibility for this document and also... Well, what did the district judge say? The district judge didn't address that question in his opinion. And the... So you say this is an allegation, a complaint that has never been ruled on? No, I'm saying this was raised, but this allegation had... He didn't address it in substance in the opinion. But in addition to preparing the draft, I'd like to point out there are two allegations in the complaint that they also were the ones who filed the erroneous UCC-3. And as you told us, they could not do that without the signature of J.P. Morgan, correct? Yes, based on the misrepresentations made by Mayor Brown. Okay, well, thank you to both counsel. We'll move on to our next...